FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

**FEB 2 0 2004**

Betty A. Griess, Clerk
Cheyenne

Bradley T. Cave, P.C.
Laura D. Windsor
HOLLAND & HART LLP
Post Office Box 1347
Cheyenne, Wyoming 82003
(303) 778-4200

ATTORNEYS FOR PLAINTIFFS

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

H&R BLOCK TAX SERVICES and HRB
ROYALTY, INC.,

  Plaintiff,

 v.

DANNY GRIFF and PRO TAX SERVICES

  Defendant.

**0 4 C V 0 0 6 3 -**

Civil Action No. 03-CV-____

## COMPLAINT

Plaintiffs H&R Block Tax Services ("Tax Services") and HRB Royalty, Inc. ("HRB Royalty") (collectively, "H&R Block") state the following for their Complaint against defendant Danny Griff ("Griff"):

Receipt # 3( )( )1( )
                   ___ issued
                   ___ not issued

## JURISDICTION AND VENUE

1.     Tax Services is a Missouri corporation having its principal place of business in the state of Missouri.  HRB Royalty is a Delaware corporation having its principal place of business in Nassau, Bahamas.

2.     Based on information and belief, Griff is a citizen and resident of Wyoming.

3.     On information and belief, Pro Tax Services is a Wyoming corporation that operates a storefront in Evanston.

4.     H&R Block seeks the following remedies against Griff:

     a.     Preliminary and permanent injunctive relief requiring that Griff and persons in active concert or participation with him:

          (i)     cease and refrain from the operation of any tax return preparation business in competition with H&R Block or its authorized, legitimate franchisees in or within 100 miles of Evanston, Wyoming, Wyoming for a two-year period;

          (ii)     deliver to H&R Block and refrain from using any originals or copies, whether stored by hard copy or electronically, of H&R Block proprietary information, which specifically includes any customer lists, customer tax files, H&R Block tax preparation software, H&R Block training software, H&R Block training materials, and H&R Block business-tracking software (collectively, "Proprietary Information");

2

(iii)     assign all Yellow and White Page telephone numbers for H&R BLOCK tax services for Evanston, Wyoming to H&R Block; and

(iv)     identify by name, address and telephone number all persons and entities that may have received copies of any Proprietary Information, and provide such persons with a copy of the Court's order of injunction, directing them to deliver to H&R Block the Proprietary Information pursuant to the Court's order and refrain from further use or dissemination of the Proprietary Information;

b.     Damages in an amount to be proved at trial for the Griff's trademark infringement, false advertising, breach of contract, conversion, unjust enrichment, tortuous interference with business advantage, unfair competition, and violation of the Wyoming Consumer Protection Act; and

c.     Reasonable attorneys' fees and costs.

5.     The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

6.     Complete diversity of citizenship exists among defendants and Griff.

7.     This Court has subject matter jurisdiction under 15 U.S.C. § 1051, *et seq.*, and 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b)(1), as Griff resides in this district, and (b)(2), as the events giving rise to H&R Block's claims occurred in and continue to occur in this district.

3

## GENERAL ALLEGATIONS

9.     H&R Block is a franchisor of H&R BLOCK franchises for tax preparation services.

10.    H&R Block owns numerous United States registrations for the H&R BLOCK trademark, including the following:

| Reg. No. | Mark | Registration Date |
|----------|------|-------------------|
| 773,839 | H&R Block | July 21, 1964 |
| 1,270,198 | H&R Block | March 12, 1984 |
| 2,533,014 | H&R Block | January 22, 2002 |
| 1,502,530 | Rapid Refund H&R Block | August 30, 1988 |

11.    H&R Block spends millions of dollars each year marketing and promoting its goods and services under the H&R BLOCK trademark.  Due to extensive, long-standing, and continuous use, the H&R BLOCK trademark has acquired secondary meaning insofar as it enjoys wide recognition among the public.

12.    Years ago, H&R Block, Inc. entered into several major franchise agreements with Monte C. Nelson and Block Mountain West, Inc. ("Nelson/BMWI"), who are not parties to this case.  The major franchise agreements granted franchises to Nelson/BMWI for the operation of H&R BLOCK tax preparation businesses in particular geographic areas.  One of the major franchise agreements covered Evanston, Wyoming.

4

13. H&R Block, Inc. assigned the major franchise agreements with Nelson/BMWI to plaintiff HRB Royalty.

14. The major franchise agreements authorized Nelson/BMWI to use H&R BLOCK tax preparation materials, training materials, trademarks, trade names, and other proprietary information provided by HRB Royalty, as assignee of H&R Block, Inc., or its affiliates.

15. HRB Royalty or its affiliates annually expended funds to purchase advertising in the state of Wyoming for the benefit of Nelson/BMWI and their subfranchises.

16. As franchisees of HRB Royalty, Nelson/BMWI sold H&R BLOCK subfranchises in the state of Wyoming.

17. Defendant Griff was a subfranchisee of Nelson/BMWI.

18. Attached to the Complaint as Exhibit 1 is an agreement between Nelson/BMWI, as franchisor, and Griff, as franchisee, granting Griff a subfranchisee for Evanston, Wyoming ("Subfranchise Agreement").

19. Nelson/BMWI, HRB Royalty, Tax Services, certain of their affiliates, and others are parties to an action pending in the Circuit Court of Jackson County, Missouri styled *Wm. R. Smith, et al. v. H&R Block, Inc., et al.*, Case No. 99-CV-206379 (the "Missouri Action").

20.    By order of the Circuit Court of Jackson County, Missouri, the major franchise agreement for Evanston, Wyoming between HRB Royalty as franchisor and BMWI as franchisee expired on September 20, 2003.

21.    Simultaneously, the Subfranchise Agreement granted by Nelson/BMWI as franchisor to Griff as franchisee for Evanston, Wyoming expired.

22.    In paragraph 7 of the Evanston Subfranchise Agreement, Griff agreed not to compete with Nelson (and thus H&R Block) within 100 miles of the "franchise territory" in and around Evanston for a period of two years after termination of the Subfranchise Agreement. Exhibit 1 at 7-8, ¶ 7(b). Griff also agreed that for two years following the termination of the Subfranchise Agreement he would not use any H&R Block Proprietary Information, including "any information or knowledge concerning customers, the methods, promotion [sic], advertising or any other systems or methods of operation of [Nelson's] business or that of [Nelson's] franchises which [Defendant] may have acquired by virtue of his operations under this agreement." *Id*. at 8, ¶ 7(d). Finally, Griff also agreed not to undertake any "deliberate act prejudicial or injurious to the good will or name of Franchisor." *Id*. at 8, ¶ 7(c).

23.    To underscore the importance of these covenants, Griff also agreed that:

> This Agreement is entered into between the parties hereto with the full knowledge of its nature and extent, and [Griff] hereby acknowledges that the qualifications for a franchise from Franchisor are special, unique and extraordinary, and that this Agreement would not be entered into by Franchisor except upon condition that such restrictive covenants be

embodied herein, and as such be enforceable by injunctive relief in the event of breach by [Griff].

*Id.* at 9, ¶ 7(g).

24.     In addition, in paragraph 11 of the Subfranchise Agreement, Griff agreed to indemnify Nelson/BMWI for any alleged breach of the covenants of non-competition and non-disclosure that were binding upon Nelson/BMWI under his agreements with H&R Block. *Id.* at 11-12, ¶ 11(b). The covenants binding against Nelson/BMWI and in favor of H&R Block are expressly set forth in Schedule C to the Subfranchise Agreement, meaning Griff was fully aware of the benefits in H&R Block's favor. Those covenants, as summarized in Schedule C, state the following:

> (1) During the term hereof Licensee [Nelson/BMWI] will not compete, directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, with Block or Block's franchisees, or Block Mountain West, Inc. or M&V Nelson, Inc. in the business of preparing tax returns or performing related services, and

> (2) For a period of three years after the termination, or the transfer or other disposition of this franchise, [Nelson/BMWI] will not so compete as aforesaid within 100 miles of the licensed territory. Licensee [Nelson/BMWI] further covenants that during the term of this Agreement and for a term of three years after the termination or the transfer or other disposition of this license, he will not divulge to or use for the benefit of any person, association or corporation outside of the H&R Block organization, any information or knowledge concerning customers, the methods, promotion, advertising or any other systems or methods of Block's business or that of Block's franchisees which Licensee may have acquired by virtue of his operations under this Agreement . . . .

*Id.* at Ex. C.

25.    On September 17, 2003, Nelson/BMWI executed a Bill of Sale (Customer Lists, etc.), attached as Exhibit 2, which assigned to Tax Services "all customer lists, customer names, forms, files and copies of tax returns in the custody of [Nelson/BMWI] or obtained in operating its business as a tax preparer under any and all of the Major Franchise Agreements between [Nelson/BMWI] and HRB Royalty, Inc. or any affiliate thereof, free and clear of all liens, mortgages, claims and encumbrances."

26.    On September 17, 2003, Nelson/BMWI executed a Bill of Sale, Assignment and Conveyance, attached as Exhibit 3, which transferred and delivered to Tax Services "all of the assets, properties, interests and rights of [Nelson/BMWI] which are specifically set forth on **Schedule A** attached hereto."  Schedule A attached to the Bill of Sale, Assignment and Conveyance lists the following assets, all transferred from Nelson/BMWI to Tax Services:

> 2.    All general, financial and personnel records, ledgers, sales invoices, accounts and payable records, files, forms, books, documents, correspondence, client tax returns, customer lists, employee lists (including addresses), sales records, FranTap data, TTS mailing lists and other files and records, including electronic versions of any of the foregoing, of Seller pertaining primarily or exclusively to Seller's operation of the business.
>
> 3.    All tangible property used by Seller primarily or exclusively with respect to Seller's operation of the Business, including but not limited to all supplies, equipment, inventory and office keys.
>
> 4.    All intellectual property used by Seller primarily or exclusively with respect to Seller's operation of the Business.

8

* * *

> 6. All rights Seller has to obtain all client files, client lists
> and other client data related to the operations of Seller's
> subfranchises, to the extent Seller has rights in such data.

27.     On September 17, 2003, Nelson/BMWI executed an Assignment of Satellite Franchise Agreement, which transferred and assigned the Subfranchise Agreement to H&R Block. Exhibit 4.

28.     Griff enjoyed all privileges and benefits of the Subfranchise Agreement until the Subfranchise Agreement and the major franchise agreement on which the Subfranchise Agreement was based expired on September 20, 2003.

29.     On December 4, 2003, H&R Block sent Griff a letter, a copy of which is attached as Exhibit 5. The letter states, *inter alia*,

> [H&R Block has] the right to enforce the post-termination
> rights of Nelsen with respect to the customer files and
> demand that you immediately deliver to us the customer lists
> and customer tax returns of your former H&R Block
> business. We will maintain the confidentiality of such files,
> which will be used solely to provide tax-related services to
> the H&R Block customers to whom the files relate. We also
> demand that you comply with such other post-termination
> obligations of your subfranchise agreements with respect to
> competing with the Franchisor under such agreements.

30.     Griff has continued his tax preparation businesses under the name Pro Tax Services in Evanston, using the same location, telephone numbers, computers, customer files, customer lists, and customers' previous year's tax returns that were used until September 20, 2003 in his H&R BLOCK business. Griff is competing and plans to

continue to compete in Evanston with H&R Block's licensed, legitimate franchisee for that location.

31.     To that end, Griff and Pro Tax Services have run advertisements that lead consumers to believe that the new business is authorized to perform H&R Block tax preparation services, and that H&R Block has undergone a name change.   The advertisements contain the following misleading and untrue statements:

- Pro Tax Services was "Previously operated as H&R Block"

- Under the heading "We have made only one change to our business: Our Name", stating:

    - "Same Staff"

    - "Same Address"

    - "Same Services"

-  "We have all of your past tax files"

- "All the fine services we have been able to provide in the past will remain the same in the future!  (Individual Business, Electronic Filing and **Quick Refund**)" (emphasis added)

- "We will have the same staff and preparers that we have had in the past with over 59 years of combined tax experience."

- "Our location . . . and telephone numbers . . . remain the same."[1]

---

[1]     These advertisements are for Pro Tax Services' Kemmerer, Wyoming office, which previously was operated as H&R Block but is the subject of a separate dispute.

32.     Griff has violated the Subfranchise Agreement by failing to deliver the Proprietary Information to H&R Block.

33.     Griff has further violated the Evanston Subfranchise Agreement by competing with H&R Block within 100 miles of Evanston and within two years of termination of the Subfranchise Agreement and H&R Block's major franchise agreement with Nelson/BMWI.

34.     Customers in Evanston received tax preparation services from Griff's H&R BLOCK franchise. Their tax returns include the H&R BLOCK name and mark, and were in fact prepared by H&R Block. Those customers reasonably expect that H&R Block will maintain the confidentiality and privacy of their customer files, tax returns, and confidential information, and will not allow others outside of H&R Block access to such information.

35.     On information and belief, Griff continues to use without permission the H&R Block's marks in formal advertising and otherwise to identify and promote his tax preparation services.

(..continued)
On information and belief, Griff has used the same advertisements to advertise for his tax preparations businesses operating under the name Pro Tax Services in Evanston.

## COUNT I – TRADEMARK INFRINGEMENT
## UNDER § 32 OF THE LANHAM ACT
### (AGAINST GRIFF AND PRO TAX SERVICES)

36.     H&R Block incorporates in full the preceding paragraphs.

37.     H&R Block owns numerous valid and incontestable registrations issued by the PTO for H&R BLOCK.

38.     Griff and Pro Tax Services have used, and are using, H&R Block's protected trademarks in commerce without the consent of H&R Block.

39.     The actions of Griff and Pro Tax Services as described above, and specifically their unauthorized use of the H&R BLOCK mark to identify and promote tax preparation services, is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Griff and Pro Tax Services with H&R Block, or as to the origin, sponsorship, or approval of Griff's and Pro Tax Service's services by H&R Block.   The conduct of Griff and Pro Tax Services constitutes trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

40.     The trademark infringement by Griff and Pro Tax Services has caused and continues to cause irreparable injury to the value and goodwill of H&R Block's trademarks, as well as irreparable injury to H&R Block's business, goodwill, and reputation.  H&R Block has no adequate remedy at law for this injury.

41.     The continued use of the H&R BLOCK trademarks by Griff and Pro Tax Services is deliberate, willful, fraudulent, and constitutes a knowing infringement of H&R Block's trademarks.  H&R Block is entitled to disgorgement of Griff's and Pro

Tax Service's profits, as well as attorneys' fees and costs incurred in this action, along with prejudgment interest.

### COUNT II – UNFAIR COMPETITION/TRADEMARK INFRINGEMENT UNDER § 43 OF THE LANHAM ACT
#### (AGAINST GRIFF AND PRO TAX SERVICES)

42.    H&R Block incorporates in full the preceding paragraphs.

43.    H&R Block possesses numerous valid and protectable trademarks.

44.    The actions of Griff and Pro Tax Services as described above, and specifically their unauthorized use of the H&R BLOCK mark to identify and promote tax preparation services, is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Griff and Pro Tax Services with H&R Block, or as to the origin, sponsorship, or approval of Griff's and Pro Tax Service's services by H&R Block.    The conduct of Griff and Pro Tax Services constitutes unfair competition and trademark infringement in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

45.    Griff's and Pro Tax Service's trademark infringement has caused and continues to cause irreparable injury to the value and goodwill of H&R Block's trademarks, as well as irreparable injury to H&R Block's business, goodwill, and reputation. H&R Block has no adequate remedy at law for this injury.

46.    Griff's and Pro Tax Service's continued use of the H&R BLOCK trademarks is deliberate, willful, fraudulent, and constitutes a knowing infringement of H&R Block's trademarks.  H&R Block is entitled to disgorgement of Griff's and Pro

Tax Service's profits, as well as attorneys' fees and costs incurred in this action, along with prejudgment interest.

## COUNT III – FALSE ADVERTISING
## UNDER § 43 OF THE LANHAM ACT
### (AGAINST GRIFF AND PRO TAX SERVICES)

47.    H&R Block incorporates in full the preceding paragraphs.

48.    The actions of Griff and Pro Tax Services as described above, and specifically Griff's and Pro Tax Service's unauthorized use of the H&R BLOCK mark to identify and promote tax preparation services, constitute false or misleading statements concerning the affiliation, connection, or association of Griff and Pro Tax Services with H&R Block, or the origin, sponsorship, or approval of Griff's and Pro Tax Service's services by H&R Block.

49.    The actions of Griff and Pro Tax Services have deceived the intended audience concerning the affiliation, connection, or association of Griff and Pro Tax Services with H&R Block, or the origin, sponsorship, or approval of Griff's and Pro Tax Service's services by H&R Block.  Alternatively, the actions of Griff and Pro Tax Services have the tendency to deceive a substantial portion of the intended audience concerning the affiliation, connection, or association of Griff and Pro Tax Services with H&R Block, or the origin, sponsorship, or approval of Griff's and Pro Tax Service's services by H&R Block.

50.    Griff's and Pro Tax Service's deception is material insofar as it is likely to influence the purchasing decisions of the deceived consumers.

51.     The tax preparation materials provided by H&R Block to Griff and Pro Tax Services traveled in interstate commerce.

52.     The conduct of Griff and Pro Tax Services constitutes trademark infringement in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

53.     Griff's and Pro Tax Service's false advertising has caused and continues to cause irreparable injury to the value and goodwill of H&R Block's trademarks, as well as irreparable injury to H&R Block's business, goodwill, and reputation.  H&R Block has no adequate remedy at law for this injury.

54.     Griff's and Pro Tax Service's continued false advertising is deliberate, willful, fraudulent, and constitutes a knowing infringement of H&R Block's trademarks. H&R Block is entitled to disgorgement of Griff's and Pro Tax Services' profits, as well as attorneys' fees and costs incurred in this action, along with prejudgment interest.

## COUNT IV – BREACH OF CONTRACT
### (AGAINST GRIFF)

55.     H&R Block incorporates in full the preceding paragraphs.

56.     Griff entered into the Subfranchise Agreement with Nelson/BMWI.

57.     Griff and Nelson/BMWI intended the Subfranchise Agreement to be for the direct benefit of H&R Block and, consequently, H&R Block is a third party beneficiary of those contracts.

58.     Alternatively, H&R Block succeeded to the post-termination rights of Nelson/BMWI under the Subfranchise Agreement by reason of the Bill of Sale

(Customer Lists, Etc.), attached as Exhibit 2, the Assignment and Conveyance, attached as Exhibit 3, and the Assignment of Satellite Franchise Agreement, attached as Exhibit 4.

59.     Griff has breached the Subfranchise Agreement's covenant against competition, as set forth in Paragraph 5 of the Subfranchise Agreement.

60.     Griff has breached the Subfranchise Agreement's covenant to refrain from use of certain information, as set forth in Paragraph 5 of the Subfranchise Agreement.

61.     Griff's breaches have caused and/or will cause H&R Block injuries.

62.     H&R Block's injuries related to Griff's breaches are not readily or fully compensable by an award of money damages.

63.     H&R Block is entitled to injunctive relief requiring Griff to return to H&R Block the Proprietary Information and to refrain from competition for a period of two years within 100 miles of the franchises in and surrounding Evanston, Wyoming.

### COUNT V – UNJUST ENRICHMENT
#### (AGAINST GRIFF AND PRO TAX SERVICES)

64.     H&R Block incorporates in full the preceding paragraphs.

65.     Griff and Pro Tax Services have received and will receive substantial benefits from the use of the Proprietary Information.

66.     Griff and Pro Tax Services have been and will be unjustly enriched, at the expense of H&R Block, by the use of the Proprietary Information.

## COUNT VI – CONVERSION
### (AGAINST GRIFF AND PRO TAX SERVICES)

67.     H&R Block incorporates in full the preceding paragraphs.

68.     H&R Block has legal title to its Proprietary Information.

69.     At all relevant times, H&R Block has had the right to possess its Proprietary Information.

70.     Griff and Pro Tax Services have exercised dominion over H&R Block's Proprietary Information in a manner that has denied H&R Block its right to use the Proprietary Information for its economic benefit, or for the economic benefit of its franchisees and subfranchisees.

71.     In its December 4, 2003 letter attached as Exhibit 5, H&R Block demanded that Griff return H&R Block's Proprietary Information. Nevertheless, Griff and Pro Tax Services have not returned H&R Block's Proprietary Information.

72.     The conversion of H&R Block's Proprietary Information by Griff and Pro Tax Services constitutes outrageous and/or willful and wanton misconduct, and Griff and Pro Tax Services have wrongfully profited from their misconduct.

73.     The economic benefit of the Proprietary Information is greatest for the preparation of tax returns during the tax season (the months of January, February, March, and April). During the tax season, Griff's and Pro Tax Service's access – and H&R Block's lack of access – to the Proprietary Information will cause injury to H&R Block, which is not fully or readily compensable by an award of money damages.

17

74.     H&R Block is entitled to the remedy of injunction against Griff's and Pro Tax Service's conversion of the Proprietary Information.  In the alternative, H&R Block is entitled to damages, including punitive damages, in addition to or in lieu of injunctive relief.

## COUNT VII – TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE BUSINESS ADVANTAGE
### (AGAINST GRIFF AND PRO TAX SERVICES)

75.     H&R Block incorporates in full the preceding paragraphs.

76.     H&R Block had a valid contractual relationship with the customers for whom Griff, operating as a subfranchisee of H&R Block, previously provided tax-related services.  Alternatively, H&R Block had a valid expectancy that the customers for whom Griff, operating as a subfranchisee of H&R Block, previously provided tax-related services, would continue to obtain tax-related services from H&R Block, its franchisees, and subfranchisees.

77.     Griff and Pro Tax Services had knowledge of H&R Block's valid contractual relationships and/or H&R Block's valid business expectancy.

78.     Griff and Pro Tax Services have intentionally and improperly interfered with H&R Block's valid contractual relationships and/or its valid business expectancy by causing H&R Block customers to obtain tax-related services from Griff and Pro Tax Services

79.     Griff's and Pro Tax Service's improper interference constitutes outrageous and/or willful and wanton misconduct, and Griff and Pro Tax Services have wrongfully profited from their misconduct.

80.     The improper interference by Griff and Pro Tax Services has caused and/or will cause H&R Block injuries.

81.     H&R Block's injuries related to Griff's and Pro Tax Service's improper interference are not readily or fully compensable by an award of money damages.

82.     H&R Block is entitled to the remedy of injunction against Griff's and Pro Tax Service's actual and/or threatened improper interference.  In the alternative, H&R Block is entitled to damages, including punitive damages, in addition to or in lieu of injunctive relief.

### COUNT VIII – COMMON LAW UNFAIR COMPETITION
#### (AGAINST GRIFF AND PRO TAX SERVICES)

83.     H&R Block incorporates in full the preceding paragraphs.

84.     H&R Block possesses numerous valid and protectable trademarks.

85.     Griff's and Pro Tax Service's actions as described above, and specifically Griff's and Pro Tax Service's unauthorized use of the H&R BLOCK mark to identify and promote Pro Tax Service's tax preparation services, is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of Griff and Pro Tax Services with H&R Block, or as to the origin, sponsorship, or approval of

Griff's and Pro Tax Service's services by H&R Block.  The conduct of Griff and Pro Tax Services constitutes unfair competition.

86.    Griff's and Pro Tax Service's unfair competition has caused and continues to cause irreparable injury to the value and goodwill of H&R Block's trademarks, as well as irreparable injury to H&R Block's business, goodwill, and reputation.  H&R Block has no adequate remedy at law for this injury.

87.    The continued use of the H&R BLOCK trademarks by Griff and Pro Tax Services is deliberate, willful, fraudulent, and constitutes a knowing infringement of H&R Block's trademarks.  H&R Block is entitled to disgorgement of Griff's and Pro Tax Service's profits, as well as attorneys' fees and costs incurred in this action, along with prejudgment interest.

## COUNT IX – VIOLATION OF WYOMING CONSUMER PROTECTION ACT
## WYO. STAT. ANN. § 40-12-101 ET SEQ.
### (AGAINST GRIFF AND PRO TAX SERVICES)

88.    H&R Block incorporates in full the preceding paragraphs.

89.    The actions of Griff and Pro Tax Services, as described above, and specifically Griff's and Pro Tax Service's unauthorized use of the H&R BLOCK mark to identify and promote tax preparation services, constitute a deceptive trade practice because it represents that Griff's and Pro Tax Service's tax services are affiliated, connected, or associated with H&R Block, or are sponsored or approved by H&R Block.

20

90.     H&R Block gave notice to Griff and Pro Tax Services of their unlawful deceptive trade practice, and the damages that would continue to be suffered by H&R Block if Griff's and Pro Tax Service's unlawful deceptive trade practices continued.

91.     The deceptive trade practice of Griff and Pro Tax Services has caused and/or will cause H&R Block injuries.

92.     H&R Block's injuries related to Griff's and Pro Tax Service's deceptive trade practice are not readily or fully compensable by an award of money damages.

93.     H&R Block is entitled to the remedy of injunction against the deceptive trade practice of Griff and Pro Tax Services.  In the alternative, H&R Block is entitled to damages in addition to or in lieu of injunctive relief.

WHEREFORE, HRB Royalty, Inc. and H&R Block Tax Services request the following relief:

(1) the entry of a temporary restraining order and a preliminary injunction that Griff and Pro Tax Services:

(a)     cease and refrain from the operation of any tax return preparation business in competition with H&R Block or its authorized, legitimate franchisees in or within 100 miles of the franchise area in and around Evanston, Wyoming for a two-year period;

(b)     deliver to H&R Block and refrain from using any originals or copies, whether stored by hard copy or electronically, of the Proprietary Information;

21

(c)     assign all Yellow and White Page telephone numbers for H&R BLOCK tax services for Evanston, Wyoming to H&R Block; and

(d) identify by name, address and telephone number all persons and entities that may have received copies of any Proprietary Information, and provide such persons with a copy of the Court's order of injunction, directing them to deliver to H&R Block the Proprietary Information pursuant to the Court's order and refrain from further use or dissemination of the Proprietary Information;

(2) Damages for Griff's breach of contract, to the extent H&R Block's damages can be remedied by monetary relief;

(3) Damages for Griff's and Pro Tax Service's conversion and misappropriation of trade secrets, unfair competition, violations of the Lanham Act, violation of the Wyoming Consumer Protection Act, and tortious interference with contract or prospective business advantage, to the extent H&R Block's damages can be remedied by monetary relief;

(4) Punitive damages;

(5) Reasonable attorneys' fees and costs;

(6) Prejudgment interest; and

(7) Such other relief as deemed appropriate by the Court.

Dated:  February 30, 2004.

_____

Bradley T. Cave, P.C.
Laura D. Windsor
HOLLAND & HART LLP
Post Office Box 1347
Cheyenne, Wyoming 82003

**ATTORNEYS FOR PLAINTIFF**

Plaintiffs' Addresses:

H&R Block Tax Services
4400 Main Street
Kansas City, MO  64111

HRB Royalty, Inc.
Suite 101
TK House
Bayside Executive Park
West Bay Street and Blake Road
P. O. Box N-8220
Nassau, Bahamas

3192327_3.DOC

FRANCHISE AGREEMENT INDEX

Page

1. Grant of Franchise and License.                              1

   *(a)  Exclusive grant of name and territory.

   (b)  No customer restrictions.

   (c)  Definition of related services.

2. Acceptance of Franchise and Manner of Use of Name.     3

   (a)  Acceptance and agreement to operate.

   (b)  Other names prohibited.

   (c)  Other uses of name prohibited.

3. Franchisor's Covenant Not to Compete.                       4

   (a)  In-term non-competition covenant.

   (b)  Covenant not to grant other franchise.

   (c)  Exclusion of other activities from non-
        competition covenant.

4. Franchisee's Conduct of Business.                           4

   (a)  Best efforts.

   (b)  Training of employees.

   (c)  Office maintenance.

   (d)  Office hours.

   (e)  Franchisee's personal supervision.

   (f)  Compliance with policy and procedure manual.

   (g)  Maintenance of good credit rating.

   (h)  Compliance with Federal Trade Commission Order.

*Requires independent consideration upon execution of
the Franchise Agreement

5.   Policy and Procedure Manual.                              6

     *(a)  Copy provided.

     (b)  Amendments.

     (c)  Mandatory provisions.

     (d)  Definition of breach.

6.   Books and Receipts.                                      7

     (a)  Duty to furnish copies of receipts.

     (b)  Right to inspect books.

7.   Non-Competition and Non-Disclosure by Franchisee.       7

     (a)  In-term covenant of non-competition.

     *(b)  Post-term covenant of non-competition.

     *(c)  Prejudicial actions.

     *(d)  In-term and post-term covenants of non-
           disclosure.

     (e)  Limitation on disclosure to employees.

     *(f)  Non-competition covenant of employees, officers,
           directors and partners.

     (g)  Injunctive relief.

8.   Source of Supplies.                                      9

     (a)  Agreement to offer for sale.

     (b)  Other sources.

9.   Instruction and Other Assistance.                       10

     (a)  Franchisor offers assistance in:

          (1)  Operational details.

          (2)  Office selection.

          (3)  Budget information.

          (4)  Advertising.

          (5)  Tax and management problems.

2

    (b)   Training of employees.

    (c)   Services optional.

10.  Insurance.                                       11

    (a)   Errors and omissions policy.

  *(b)   Fire insurance policy.

  *(c)   Indemnification coverage.

11.  Indemnification.                           11

    (a)   Injury to persons or property.

    (b)   Breach of non-competition obligation owed to national office.

12.  Royalties.                                       12

  *(a)   Royalties and discount.

    (b)   Increase upon transfer.

  *(c)   Event of increase.

13.  Initial Deposit.                           14

    (a)   Amount.

    (b)   Prior deposits.

    (c)   Refunds.

    (d)   Credit to extent of deposit.

14.  Term of Agreement.                       16

15.  Termination of Agreement.            16

    (a)   Material and substantial breach.

    (b)   Notice and arbitration for breach other than non-payment of royalty.

    (c)   Notice and cancellation for non-payment of royalty.

    (d)   Right to cure.

    (e)   Judicial remedies.

3

16. Payment to Franchisee Upon Termination.                18

    (a)  Price and duty to sell to Franchisor.

    (b)  Unpaid royalties.

    (c)  Assumption of liabilities and leases.

17. Ownership of Customer Lists.                           19

    (a)  Property of Franchisee until sale.

    (b)  Limitations on use.

18. Death or Incapacity.                                   20

    (a)  Franchisor's right to information and right
        to assist.

    (b)  Definition of incapacity.

    (c)  Death or incapacity as grounds for termination.

19. Assignability.                                         21

    (a)  Approval required for transfer.

    (b)  Request for approval of transfer.

    (c)  Request for approval of transfer to controlled
        corporation or partnership; personal liability
        of principal.

    (d)  Grounds for disapproval.

    (e)  Definition of controlled corporation and
        controlled partnership.

    (f)  Assumption of liabilities upon transfer to
        controlled corporation or partnership.

    (g)  Deadline for disapproval; arbitration.

20. Change in Controlled Corporation or Partnership.       25

    (a)  Notice to Franchisor.

    (b)  Request for approval of principal.

21. Heirs, Successors and Assigns.                         26

22. Loss of License by Franchisor.                         26

23. Arbitration.                                                    27

    (a)  Prerequisite to legal action.

    (b)  Selection of arbitrators; decision within 90
         days.

    (c)  Jurisdiction of arbitrators; binding effect
         of decision.

24. Non-Waiver of Breach.                                          29

25. Cancellation of Prior Understandings.                          29

26. Release of Prior Claims.                                       30

27. Applicable Law.                                                30

28. Severability.                                                  30

29. Parties Not Joint Venturers, Partners, Agents.                 31

30. Time of the Essence.                                           31

31. Notices.                                                       31

32. Attorney Fees.                                                 32

    Schedule A:  Excerpt from Federal Trade Commission
                 Order

   *Schedule B:  Non-Competition Agreement for Officers,
                 Partners and Employees

    Schedule C:  Franchisor's Non-Competition Covenants
                 with H & R Block, Inc. of Kansas City
                 or M & V Nelson, Inc.

## FRANCHISE AGREEMENT

THIS AGREEMENT, is made and entered into by and between Income Tax Service Inc. (a Wyo. Corp.), hereinafter referred to as "Franchisor", and _____ Danny Griff _____, hereinafter referred to as "Franchisee", of _____

_____ Kemmerer, Wyoming _____.

WHEREAS, Franchisor is engaged in the business of granting franchises dealing exclusively with the preparation of income tax returns and the performance of related services; and

WHEREAS, Franchisor is the licensee of certain names and service marks relating to said services which have a well established reputation and good will which are of unique benefit to Franchisor and its franchisees;

WHEREAS, said license is subject to a number of restrictions upon the use of the licensed names and service marks;

WHEREAS, Franchisee is desirous of obtaining a franchise for the performance of the above-described services:

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1. Grant of Franchise and License.

(a) Franchisor hereby grants to Franchisee the exclusive right to use the following names and service marks in connection with Franchisee's business of preparing income

tax returns and performing related services within the franchise territory consisting of ___Evanston, Wyoming___

   (1) "H&R BLOCK";

   (2) "THE INCOME TAX PEOPLE";

   (3) "AMERICA's LARGEST TAX SERVICE";

   (4) "EXECUTIVE TAX SERVICE"

   (5) "NATION'S LARGEST TAX SERVICE"'

   (6) Any other name or service mark that may be acquired by Franchisor or registered by Franchisor under appropriate service mark or trademark registration laws for use in the business of preparing tax returns and performing related services. If for any reason Franchisor should be denied the right to any trademark herein listed or later acquired Franchisor retains and has total right to replace the trade name or mark with another trademark on condition it is a trade uniform with all Franchisees of Franchise.

   (b) Notwithstanding any provision of this Agreement to the contrary, nothing herein shall prohibit Franchisee from performing services covered by this Agreement within the franchise territory for any person or firm residing outside the franchise territory, or from advertising or promoting Franchisee's business in media which may extend beyond the franchise territory.

   (c) The term "related services" means those products or services instituted, organized, sponsored or promoted by Franchisor that deal with the preparation of income tax returns, such as income tax return preparation

schools or income tax study courses, income tax films, Public Accounting or Estate and Financial Planning, and other similar products or services directly used in connection with the business of preparing income tax returns. Activities not related to the preparation of tax returns, Public Accounting and Estate and Financial Planning shall not be considered "related services" even though conducted by Franchisor under one or more of the names and marks set forth above.

2. Acceptance of Franchise and Manner of Use of Name.

(a) Franchisee hereby accepts the franchise granted hereunder and agrees to operate its business of preparing tax returns and performing related services under the names and marks referred to in paragraph 1. or names determined by Franchisor should the marks for any reason not remain controlled by Franchisor.

(b) Franchisee hereby agrees not to use any other names or marks in the conduct of the business of the franchise.

(c) Franchisee further agrees not to use, nor to permit the use of, the licensed names or marks, or any substantially similar style or spelling thereof, for any purpose other than Income Tax Preparation operation of the franchise without the express written permission of Franchisor. This restriction includes, but is not limited to, the formation of corporations, partnerships, business associations, or any other form of business organization.

3

3.   Franchisor's Covenant Not to Compete.

(a)  Franchisor hereby agrees not to compete with Franchisee, directly or indirectly, in the preparation of tax returns or the performance of related services within the franchise territory during the term of this Agreement.

(b)  Franchisor hereby agrees to grant no other franchise for the preparation of tax returns or the performance of related services within the franchise territory during the term of this Agreement.

(c)  Any activities other than the preparation of tax returns or the performance of related services performed or conducted by Franchisor, or by any subsidiary, affiliate or other franchisee thereof, shall not be subject to the provisions of this paragraph, even though conducted under one of the names or marks set forth above in paragraph 1.

4.   Franchisee's Conduct of Business.

(a)  Franchisee shall prepare quality tax returns to the best of his ability. Said returns shall be accurately completed and thoroughly checked in accordance with federal, state and local laws before they shall be returned to the clients.

(b)  Franchisee shall employ and train sufficient personnel to accommodate all customers without undue delay. In the event the Franchisee should fail to train himself and his employees to accurately prepare tax returns in any area such as estate returns, corporate or partnership returns then Franchisor shall have the right to prepare such returns

4

in Franchisee's territory at his discretion. Franchisor shall pay Franchisee no less than 5% of the gross fee of the tax return.

(c) Franchisee shall maintain a neat and orderly office.

(d) Franchisee shall maintain office hours during the tax season from 9:00 a.m. until 9:00 p.m., Monday through Friday and include at least the period beginning on the last day on which individual federal income tax returns must be filed (generally April 15). During the balance of the year, Franchisee shall maintain office hours at least from 9:00 a.m. through 5:00 p.m., Monday through Friday, unless otherwise approved in writing by Franchisor.

(e) Franchisee shall personally supervise the franchise business for at least 40 hours per week year round, with reasonable allowance for holidays and vacations.

(f) Franchisee shall manage and conduct the business in reasonable accordance with the rules and regulations set forth in the POLICY AND PROCEDURE MANUAL, including all future amendments thereto, except as otherwise provided in paragraph 5.

(g) Franchisee shall promptly pay all of its operational expenses in order to establish and maintain sound credit.

(h) Franchisee shall refrain from those activities relating to the advertising of its business and the use of its customer lists which are set forth in the

5

attached Schedule "A", which contains an excerpt from Federal Trade Commission Decision and Order In the Matter of H & R Block, Inc., a corporation, Docket No. C-2162.

   5.   Policy and Procedure Manual.

      (a)  Franchisor has furnished to Franchisee a copy of the H&R BLOCK Policy & Procedure Manual, referred to as the "Manual", which was issued by the Franchisor and of which the Franchisee hereby acknowledges receipt. Franchisor further covenants to furnish to Franchisee a copy of all amendments to the Manual.

      (b)  Franchisor expressly reserves the right to amend the Manual whenever and in such manner as, in Franchisor's sole discretion and judgement, would be reasonable and necessary to protect the quality of services or increase the long-range net profit potential of Franchisor and its franchisees, collectively.

      (c)  No provision of the Manual shall be considered mandatory unless a violation thereof shall, in the sole discretion and judgement of Franchisor, unreasonably impair the reputation, character or image of the name or service marks set forth in paragraph 1, or the quality of the services rendered hereunder. All other provisions of the Manual shall only be considered advisory in nature.

      (d)  No violation by Franchisee of any mandatory provision of the Manual shall constitute a breach hereof, or justify termination proceedings hereunder, unless;

6

(1) Such violation is material and substantial; and

(2) Such violation will, in the sole discretion and judgement of Franchisor, adversely affect the long-range net profit potential of, or work any undue hardship upon, the franchisees, individually or collectively.

6.   Books and Receipts.

(a) Franchisee shall furnish to Franchisor copies of receipts for all funds received from the preparation of tax returns and the performance of related services within the franchise territory during the term of the Agreement. Such copies, together with a summary thereof, shall be sent to Franchisor semi-monthly.

(b) All books and records of Franchisee pertaining to Franchisee's gross receipts from the preparation of tax returns and the performance of related services shall be open to inspection by Franchisor and its authorized representatives during regular business hours.

7.   Non-Competition and Non-Disclosure by Franchisee.

(a) During the term hereof, Franchisee will not compete, directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, with Franchisor or any of its franchisees in the business of preparing tax returns or performing related services.

(b) Franchisee will not so compete within _100_ miles of any franchise territory for a period of _two_ years

7

after the termination, transfer or other disposition of this Agreement.

(c) During the term of this Agreement and for a period of __two__ years thereafter, Franchisee will do no deliberate act prejudicial or injurious to the good will or name of Franchisor.

(d) During the term of this Agreement and for a period of __two__ years thereafter, Franchisee will not divulge to, or use for the benefit of, any person, association or corporation outside of the Franchisor's organization, any information or knowledge concerning customers, methods, promotion, advertising or any other systems or methods of operation of Franchisor's business, or that of Franchisor's franchisees, which Franchisee may have acquired by virtue of his operations under this Agreement.

(e) Franchisee shall furnish to its employees only that information which shall be reasonably necessary to the proper performance of their duties.

(f) Franchisee shall secure the written agreement of all of its employees, and any officers, directors or partners if Franchisee is a corporation or partnership, who are informed or trained in Franchisor's unique methods of preparing tax returns, to not divulge or use their knowledge of such methods in competition with Franchisor or any of its franchisees, in the form and to the extent set forth in the attached Schedule B. The Franchisee shall secure such agreement by obtaining the signature of each such person on

8

a form supplied by Franchisor without cost to Franchisee, and shall remit a signed copy of said form to Franchisor immediately upon execution thereof.

(g)  This Agreement is entered into between the parties hereto with the full knowledge of its nature and extent, and the Franchisee hereby acknowledges that the qualifications for a franchise from Franchisor are special, unique and extraordinary, and that this Agreement would not be entered into by Franchisor except upon condition that such restrictive covenants be embodied herein, and as such be enforceable by injunctive relief in the event of breach by Franchisee.

8.  Source of Supplies.

(a)  Franchisor hereby agrees to offer for sale at fair, reasonable and competitive prices to Franchisee, certain office supplies, forms, advertising and display materials, mats, machines, equipment and such·other items as may be necessary and proper for the conduct of the business of income tax return preparation. Franchisor shall extend credit to Franchisee for such purchases to the extent provided in paragraph 13(d).

(b)  It is expressly agreed that Franchisee may purchase any or all items needed from any source without approval from Franchisor, provided that the quality of any such item is at least equal to, and the general appearance thereof is similar to, the comparable item offered hereunder by Franchisor.

9

(c)   Franchisor agrees to furnish F.O.B. place of Mfg. or purchase point of Franchisor certain specialized forms and supplies at no cost to Franchisee except freight,

at the option of the Franchisor an annual processing machine allowance of 1% of the first 20,000.00 and 1/2 of 1% of all volume over that, where a Franchisee has any contract added to his 1st contract for royalty purposes netting a net 30% royalty, that volume is allowed only 1/2 of 1% allowance.

9.   <u>Instruction and Other Assistance</u>.

(a)   Franchisor hereby agrees to provide Franchisee with the following:

(1)   Instruction in the operational details of the income tax return business, or related services.

(2)   Advice in the selection and location of an office.

(3)   Information necessary to establish an operating budget.

(4)   Such promotion annd advertising as deemed advisable by Franchisor in his sole discretion and at his sole expense.

(5)   Assistance in managerial problems which may arise during the period of this Agreement.

(b)   Franchisor hereby agrees to make training material available in the matter of preparing tax returns, customer relations and procedures of Franchisor. Such training is to take place in Salt Lake City, Utah, at a time

10

designated by Franchisor.

(c)  The parties hereto expressly agree that the services described in this paragraph are optional, and that the Franchisee is under no obligation to accept them.

10.  Insurance.

(a)  Franchisee hereby agrees to secure and maintain, at his expense, a policy of fire insurance, written by a responsible insurance company authorized to do business in the State of __Wyoming__, in an amount equal to not less than the insurable value of any building, together with any improvements thereon, which Franchisee leases or for which Franchisee in any way becomes responsible. (Fire Legal Liability on non-owned property)

(b)  Franchisee further agrees to secure and maintain insurance in a reasonable amount, which has been approved by Franchisor, for the purpose of carrying out the indemnification provision of paragraph 11(a) below.

11.  Indemnification.  Franchisee hereby agrees to indemnify and hold harmless Franchisor from any and all liability, damage, expense, cause of action, suit, claim or judgment arising from:

(a)  Any injury to persons or property arising out of any act, failure to act, or negligence of Franchisee, its agents or employees; and

(b)  Any alleged breach of the covenants of non-competetion and non-disclosure, and any amendments thereto or substitutions therefor, which are binding upon Franchisor

11

as licensee of the names and marks set forth above in paragraph 1, where such breach arises out of any act, failure to act, or negligence of Franchisee, its agents or employees. Said covenants as now exist are set forth in the attached Schedule "C" which is by this reference made a part hereof.

12. <u>Royalties</u>.

(a) Franchisee agrees to pay Franchisor, as franchise royalty a sum equal to __60__ percent of Franchisee's gross receipts from the preparation of income tax returns and the performance of related services. Franchisee further agrees to submit reports to Franchisor (conformed by affidavit, if requested by Franchisor) of such receipts as of the 15th and the last day of each month within the five days after the end of each such reporting period. Payment of such royalties shall be due within thirty (30) days after the close of each reporting period; provided, however, that if such payment is made within five (5) days after a report period, and if all previous payments have been made (unless a bona fide dispute has arisen as provided in paragraph 15), a discount of ten (10) percentage points from the established __60__ percent royalty shall be allowed by Franchisor. (For example, for the first half of January, if payment is remitted and postmarked by the U.S. Postal Service by January 20, only __50__ percent is due; otherwise __60__ must be paid by February 15). For any year in which such gross receipts exceed $__5,000.00__ the __60%__ fee

12

12(a)

For as long as the owner of the Evanston, Wyoming franchise is the same person as the owner of the Kememer, Wyoming franchise, the volume will be combined for royalty purposes. Franchisee will pay all direct advertising for Evanston, Wyoming.

shall be applicable only to the first $ 5,000.00 , gross receipts and the franchise fee on the excess shall be 40% , subject to the discount provision hereinabove provided.

(b) Upon the happening of an "Event of Increase" as defined below, the franchise royalty charged hereunder shall automatically increase to an amount equal to the franchise royalty being offered by Franchisor at the time of such event to prospective franchisees in territories comparable with the franchise territory. In no event, however, shall such royalty exceed 50 percent after deduction of the allowed discount of 10 percentage points referred to above in paragraph 12(a). For purposes of this section Gross Receipts shall mean the total gross receipts from customers for the preparation of all tax returns and related services, from all offices, branches, divisions operating under authority of this franchise.

(c) An "Event of Increase" shall mean:

(1) The transfer, assignment, gift or other disposition, by operation of law or otherwise, of the Franchisee's rights under this Agreement to another (except to the original individual Franchisee's spouse, or to a corporation, partnership, trust or other business organization or entity in which no one other than Franchisee, his spouse, or any or both of them owns an interest, or except to a controlled corporation or controlled partnership as defined in paragraph 19(e) of this Agreement, or, if Frnachisee is an individual, except to

Franchisee's estate or legal representative upon Franchisee's death); or

(2) If this franchise is held by, or in the name of, a corporation, partnership, trust or other business organization or entity, the transfer, assignment, gift or other disposition of any interest or interests therein, whether in one or more transactions, by which a controlling interest in such entity is transferred to one or more persons, corporations, partnerships, trusts or other associations other than the original Franchisee hereunder (unless such controlling interest is transferred to the spouse of the original individual Franchisee hereunder).

13. Initial Deposit.

(a) As security for Franchisee's faithful performance of the terms of this Agreement, Franchisee hereby deposits with Franchisor, and Franchisor hereby acknowledges receipt of, the sum of _Three hundred dollars ($300.00)_, as determined from the following schedule, with the population figure determined as of the date of this contract from the most recent Standard Rate and Data Service figures:

| FRANCHISE TERRITORY POPULATION | DEPOSIT REQURIED |
|---|---|
| Less than 15,000 | $ 300.00 |
| 15,000 - 49,999 | 500.00 |
| 50,000 - 149,999 | 1,000.00 |
| 150,000 - 399,999 | 3,000.00 |
| 400,000 - 749,999 | 5,000.00 |
| 750,000 - 1,499,999 | 10,000.00 |
| 1,500,000 or more | 20,000.00 |

(b) In the event that this Agreement replaces a

14

prior franchise agreement between the parties hereto, covering the franchise territory, no deposit shall be required of Franchisee in excess of the amount deposited under said prior franchise agreement. Such prior deposit, if any, shall satisfy the deposit required of Franchisee hereunder, and shall be held by Franchisor subject to all of the terms and conditions hereof.

(c) Any deposit required hereunder shall be held by Franchisor without interest and may be comingled with Franchisor's other funds. Said deposit shall be refunded to Franchisee __3__ years after the termination, sale, transfer or other disposition of this Agreement by Franchisee; provided, however, that upon the death of an individual Franchisee, said deposit shall be refunded within thirty (30) days following written notice to Franchisor that the provisions of paragraph 18 herein have been complied with. However, if the assignee of this Agreement is a controlled corporation or a controlled partnership, or the spouse, or any or all of them, of the Franchisee, then Franchisee's deposit hereunder, if any, upon the transfer to said assignee, shall be held by Franchisor in accordance to this paragraph in satisfaction of said assignee's obligation to make the deposit required herein. In such event, Franchisee shall have no further interest in said deposit. If no deposit was required hereunder of Franchisee, then no deposit shall be required of said assignees.

(d) Franchisor agrees to extend credit to

15

Franchisee with regard to the initial supplies purchased annually after October 1 from Franchisor, thereby deferring cash payment of the initial supplies order until the following February 10. Such credit shall not exceed the amount of Franchisee's deposit hereunder.

14. <u>Term of Agreement</u>. The term of this Agreement shall run for a period of five (5) years from the date hereof, with further provisions that it shall be automatically renewed for successive periods of five (5) years each, unless mutually terminated or terminated pursuant to paragraph 15.

15. <u>Breach and Termination of Agreement</u>.

(a) Any material and substantial breach of the terms hereof by Franchisee shall constitute grounds for termination of this Agreement and for payment by Franchisor to Franchisee or his assigns pursuant to paragraph 16.

(b) Prior to such termination, Franchisor shall give Franchisee written notice of the alleged breach by certified or registered mail and Franchisee may, within fifteen (15) days following the receipt of such notice, except in the case of a breach for non-payment of the franchise royalty, request arbitration of such alleged breach pursuant to paragraph 23, if it has not already been corrected. If Franchisee attempts to correct the alleged breach within said fifteen (15) day period, and so notifies Franchisor of such correction, Franchisor shall advise Franchisee within seven (7) days thereafter, whether the

16.

alleged breach has been corrected. If such advice is in the negative, the Franchisee shall have fifteen (15) days thereafter to request arbitration. In the event that Franchisee does not request arbitration within said period, Franchisor may then terminate this Agreement upon written notice thereof to Franchisee.

(c) In the event of non-payment of the franchise royalty provided herein for a period of fifteen (15) days following receipt by Franchisee of notice of non-payment from Franchisor, this Agreement may be cancelled and terminated by Franchisor without arbitration and without further notice; provided however, that this provision shall not apply and arbitration shall be available hereunder if there is a bona fide dispute as to the amount of the unpaid franchise royalty and Franchisee pays any undisputed portion thereof, or if there is a bona fide dispute as to whether or not the franchise royalty has been paid. No such termination shall take place while such arbitration or any subsequent court proceeding is pending.

(d) Except as to a breach for non-payment of the franchise royalty as to which there is no bona fide dispute, which breach shall be governed as expressly set forth above, a Franchisee may correct any breach, and thereby prevent termination of this Agreement, within fifteen (15) days after a determination by arbitration or subsequent court proceeding that a breach justifying termination has occurred.

17

(e)   Nothing  contained  in this  paragraph  shall preclude  Franchisor  from  seeking  such  other  judicial remedies  as  may  be  desired:  provided,  however,  that Franchisor  shall  first  give  to Franchisee  fifteen (15) days written notice  of its intent  to do so, during which fifteen (15) days Franchisee shall be entitled to request arbitration pursuant to paragraph 23.

16. Payment to Franchisee Upon Termination.

(a) In the event of the termination of this Agreement for any reason other than sale to Franchisor, the Franchisee shall sell, assign and deliver to Franchisor all of the properties and assets of Frachisee's business operated hereunder (including, without limitation, all equipment, customer files, supplies of such business), and Franchisor shall pay a fair and equitable price to the Franchisee for Franchisee's business operated hereunder, (excluding any allowance for Goodwill as that is deemed owned by the Franchisor in the name and system and proceedures franchised), but no less than the total of the following:

(1) Depreciated book value of all of Franchisee's equipment, if same shall be free of all liens;

(2)a) Cost price, including frieght-in, less any amounts owed thereon, of all of Frachisee's usable supplies on hand;        (b) If the Franchisee feels to ask a price of any amount in excess of (1) (2)    , and if Frachisor does not agree that there is value in excess of cost less depreci- ation, then the Franchisor may request the

18

item to arbitration persuant to paragraph 23.

(3)  All of Franchisee's normal, recurring, ordinary, and reasonable off—season (May 1 through December 31) expenses in excess of gross off-season revenues from the May 1 immediately preceding the date of purchase to the date of purchase (such expenses including, but not limited to, rent, wages, advertising, etc., but excluding Franchisee's salary, if any; and such revenues including, but not limited to, tax return preparation fees, tuition tax school payments, etc.) but only if the purchase by Franchisor is consumated during such off—season.

(b)  Any franchise royalties due and unpaid to date of purchase shall be deducted from the purchase price as determined above.

(c)  Leases on real and personal property may be assumed by Franchisor if mutually agreeable between the parties hereto, and if Franchisor consents in writing to assume payment of the rent and other liabilities thereunder and save Franchisee harmless therefrom.

17.  Ownership of Customer Lists.

(a)  All customer lists, customer names, forms, files and copies of tax returns in Franchisee's custody shall be, and remain at all times, the property of Franchisee; provided however, that in the event of termination of this Agreement, and upon payment as required by paragraph 16, such property rights of Franchisee thereto shall be transferred to and shall vest in Franchisor.

19

Franchisee    shall    immediately    thereafter    deliver    to Franchisor all such customer lists, customer names, forms, files and copies of tax returns.

(b)  Neither   party   shall   have   the   right   or privilege to use the information appearing on file copies of customer tax returns during  the  term  of  this  Agreement; provided however, that such information may be used solely in the preparation of internal statistics or tax returns for subsequent years.

18.  <u>Death or Incapacity</u>.

(a)  Upon   the   death   or    incapacity   of   an individual Franchisee, Franchisor shall be entitled to be informed by Franchisee or is legal representative as to what actions   are   being   taken   to   prevent   or   minimize  the interruption of  the  services  required  or  to  be  rendered hereunder.  Franchisor  shall  be  further  entitled, but not required,  to  render  whatever  assistance  is  requested. Franchisor shall be entitled to reimbursement by Franchisee or Franchisee's estate for any reasonable expenditures thus incurred if other than the normal services provided for in paragraph 9.

(b)  For puroses of this paragraph, "incapacity" is defined as the inability of the Franchisee, according to competent  medical  authority,  to  perform  the  duties  and obligations under this Agreement for six months or more as the result of illness or accident.

(c)  Death or incapacity shall not, of itself, be

20

grounds for termination of this agreement unless:

(1) Franchisee or his legal representative fails for a period 180 days after such death or incapacity to commence action to assign this Agreement as permitted by paragraph 19; or

(2) Such Assignment is not completed within one (1) year after such death or incapacity; provided however, that any period of time during which an assignment is subject to Franchisor's approval, and during which any issue relative to a disapproval of any assignment is in arbitration or is pending in a court of law, shall not be a part of such one (1) year as provided herein. If such action or assignment is not timely taken or made as aforesaid, Franchisor shall have the right to terminate this Agreement, subject to the terms of paragraphs 15 and 23.

19. Assignability.

(a) Franchisee's interest under this Agreement may be transferred and assigned by Franchisee, and Franchisee's heirs, successors and assigns, to any person, partnership, or corporation; provided however, that no proposed transfer may be made without the prior written consent of Franchisor, after such is requested by Franchisee as hereinafter described.

(b) A request for approval of a proposed transfer to other than a "controlled corporation" or "controlled partnership" as defined below shall include the effective date of the proposed transfer, the name, address and

21

principal occupation or business activity of the proposed transferee, and such other information (including financial statement, business references, and the like) that Franchisor may reasonably request for the purpose of approving or disapproving such proposed transferee.

(c) A request for approval of a proposed transfer to a controlled corporation or controlled partnership shall include, in addition to the items set forth above, the name, address and principal occupation of each officer and director or each partner, as the case may be, of such corporation or partnership, together with the name, address, principal occupation and ownership interest of each stockholder holding 10% or more of any class of voting securities of such corporation. Franchisor shall thereafter be given further written notice of any changes in the above-required information. The request for transfer shall also include the name and address of an individual hereinafter referred to as the "principal", who shall:

(1) Be a director or partner of the proposed transferee and who will personally assume and be bound by all of the terms, covenants and conditions of this Agreement; and

(2) Execute a document satisfactory to Franchisor to that effect, to the end that Franchisor may look to such individual in addition to the proposed transferee, for the proper performance of this Agreement. The request for transfer shall also include such other

22

information (including financial statements, business references, and the like) that Franchisor may reasonably request for the purpose of approving or disapproving such transferee or principal.

(d) Franchisor agrees that it will not arbitrarily or unreasonably exercise its rights to approve or disapprove any proposed transferee or principal, and any disapproval by Franchisor with respect to a proposed transferee or principal shall be only for reasons which are material and substantial in nature. In the event that a proposed principal is the individual Franchisee under this agreement, the Franchisee cannot be disapproved as the principal or be subject to the approval or disapproval provisions herein.

(e) For purposes of this Agreement, a "controlled corporation" or "controlled partnership" shall be a corporation or partnership in which Franchisee, or Franchisee's spouse, or any or both of them, directly or indirectly, hold in the aggregate a majority (a majority being over 50%) of each class of voting securities (if a corporation) or the majority controlling interest (if a partnership). With respect to a corporation or partnership, its voting securities or majority controlling interest, as the case may be, shall be deemed held directly by Franchisee if registered in any or all of their respective names alone or jointly with another. They shall be deemed held indirectly by said individuals if registered in the name of

23

a broker, trustee, executor, administrator, or other nominee for the benefit of said individuals or any of them.

(f)  Transfer to either a controlled corporation of controlled partnership of any interest in this Agreement shall not result in an increase in franchise royalties, and additional deposit, or require a request for transfer or designation of a principal. Upon such a transfer, however, Franchisee shall remain liable for the prompt and faithful performance of all terms, covenants and conditions of this Agreement until a principal is appointed and approved by Franchisor or this Agreement is transferred or assigned to a transferee approved by Franchisor.

(g)  A proposed transfer shall be deemed approved by Franchisor thirty (30) days after the receipt by Franchisor of the request for approval unless Franchisor's disapproval of the proposed transferee or, if applicable, the principal thereof, is given within said thirty (30) day period in a writing setting forth the reasons for such disapproval. In the event of disapproval, Franchisee may submit an alternative transfer request to Franchisor within Thirty (30) days after such disapproval, subject to all of the foregoing conditions with respect to the initial request for approval. Franchisee shall, in any event, have thirty (30) days from the receipt of a notice of disapproval to request arbitration pursuant to paragraph 23 of this Agreement. In the absence of disapproval by Franchisor, or upon approval by subsequent arbitration or court decision,

24

of such proposed transferee or principal, such transferee or principal, as the case may be, shall assume in writing all of Franchisee's obligations hereunder and be entitled to all benefits accruing thereto, and shall execute the document required by subparagraph (c) above.

20.  <u>Change in Controlled Corporation or Partnership.</u>

(a)  If Franchisee is a controlled corporation or a controlled partnership, Franchisee shall notify Franchisor in writing within sixty (60) days of the occurrence of any of the following events:

(1)  Termination of Franchisee's status as a controlled corporation or controlled partnership at any time during the term of this Agreement;

(2)  The death of, or sale, transfer or other complete disposition or termination of the interest in Franchisee, direct or indirect, of any individual who is then personally liable for the prompt and faithful performance of all of the terms, covenants and conditions of this Agreement (e.g. the original, individual Franchisee of this Agreement who shall have assigned the same to a controlled corporation or partnership); or

(3)  The death, during the term of this Agreement, of any individual who is a principal of Franchisee as required by paragraph 19.

(b)  Said notice shall also include the name and address of an individual who shall be a director or partner of Franchisee, satisfactory to Franchisor, and who will

25

personally assume and be bound by all of the terms, covenants and conditions of this Agreement, and who will execute a document satisfactory to Franchisor to that effect, to the end that Franchisor may look to such individual, as "principal", in addition to Franchisee, for the proper performance of this Agreement. If the proposed principal is the individual Franchisee under this Agreement or is Franchisee's spouse, such proposed principal cannot be disapproved by Franchisor unless such proposed principal shall be legally incompetent, shall not be of legal age, or shall at any time have been convicted of any crime involving acts of moral turpitude.

21. Heirs, Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, assigns, heirs, executors, administrators, and legal representatives, and Franchisee shall have and hold this franchise in peace and tranquility so long as it timely performs and faithfully observes and complies with all of the covenants, terms and conditions of this Agreement incumbent upon it.

22. Loss of License by Franchisor. If for any reason the rights of Franchisor to the names and service marks set forth in paragraph 1 should be terminated while this Agreement is of full force and effect, this Agreement may be cancelled, or may be continued in full force and effect under other trade names at the sole election of Franchisor and without any payment pursuant to paragraph 16.

26

Franchisor's election under the paragraph shall be made by serving notice of the same upon Franchisee within thirty (30) days of Franchisor's loss of the above-described rights.

23. Arbitration.

(a) Every effort shall be made to settle amicably any dispute between the parties arising out of or by reason of this Agreement, or the construction or performance thereof. In the event a mutual settlement or resolution of any such dispute cannot be achieved within fifteen (15) days after written notice by either party to the other requesting arbitration (the "arbitration notice"), the dispute must be submitted for arbitration before any legal action by either party may be commenced. The arbitration and award shall be in accordance with the rules and regulations then obtaining of the American Arbitration Association or any other rules unanimously adopted by the arbitrators.

(b) Each party shall appoint an arbitrator and advise the other party of the choice. If either party fails to appoint an arbitrator within ten (10) days after notification of the appointment by the other party, the person appointed as arbitrator may appoint an arbitrator to represent the party in default. The two arbitrators appointed in either manner shall then select a third arbitrator, and should they be unable to agree on a third arbitrator within 15 days after the date of the last to be appointed then the American Arbitration Association, or any

27

other organization mutually acceptable to the two arbitrators, shall be requested to apppoint the third arbitrator. Time is of the essence in these proceedings and a decision of the arbitrators shall in all events be rendered within 90 days after giving of the arbitration notice. Additional time for the decision may be granted by mutual consent of Franchisor and Franchisee, or upon request of two of the three arbitrators, but in no event more than 90 days after the last day of the initial 90 days. If said decision is not rendered within the time set forth herein, the arbitration may be terminated by either party and either party may then proceed to have the matter resolved in a court of law.

(c) Except as to a breach for non-payment of the franchise royalty, where there is no bona fide dispute as herein above provided in paragraph 15, the provisions relating to arbitration shall be applied to any alleged breach of this Agreement and any other disputes that may arise from time to time, and all other rights and privileges of the parties hereto under any other provisions of this Agreement shall not be affected by any such arbitration procedure. The arbitrators shall have no right to include or decide issues not directly involved in any dispute before them or attempt to change any of Franchisors policies or covenants in this contract. The decision of the arbitrators shall be by a majority thereof. The expense of arbitration shall be borne equally by Franchisor and Franchisee. The

28

arbitration shall be open to all interested parties, subject to the rules of the arbitrators, and anyone shall give information upon request of either party or the arbitrators. The decision of the arbitrators shall be legally binding upon the parties thereto, unless such decision would cause either party to incur an expenditure, exclusive of costs of arbitration, of more than $5,000.00, or unless such decision provides or gives either party grounds for the termination of the franchise herein granted. In such event the parties hereby expressly stipulate that such decision, although not binding, including a transcript of the record therein, or any part therof, may be admitted into evidence without objection in any litigation on the dispute between the parties hereto. The location  of any arbitration proceeding shall be held in Salt Lake City, Utah, unless determined to at another location and approved by Franchisor.

24. <u>Non-Waiver of Breach</u>. The failure of either party hereto to enforce at any time or for any period of time any one or more of the terms or conditions of this Agreement shall not be deemed a waiver of such terms or conditions or of either party's rights thereafter to enforce each and every term and condition of this Agreement.

25. <u>Cancellation of Prior Understandings</u>. This Agreement expresses fully the understanding by and between the parties hereto. All prior understandings, or commitments of any kind, oral or written, as to this franchise and any matter covered by this Agreement are hereby superseded and

29

cancelled, with no further liabilities or obligations of
the parties with respect thereto except as to any monies due
and unpaid between the parties to this Agreement at the time
of the execution of this Agreement.

26. <u>Release of Prior Claims</u>. By executing this
Agreement, Franchisee, individually and on behalf of
Franchisee's heirs, legal representatives, successors and
assigns, and each assignee of this Agreement by accepting
assignment of the same, hereby forever releases and
discharges Franchisor, its officers, directors, employees,
agents and servants, including Franchisor's subsidiary and
affiliated corporations, their respective offices,
directors, employees, agents and servants, from any and all
claims relating to or arising under any franchise agreement
or agreements between the parties and executed prior to the
date of this Agreement, including but not limited to any and
all claims, whether presently known or unknown, suspected or
unsuspected.

27. <u>Applicable Law</u>. This Agreement shall be construed
according to the laws of the State of Utah; provided,
however, no violation hereof shall be deemed a breach of
contract if occasioned by the laws or public policy (as
judicially decreed) of the state or local governing
authority of the franchise territory.

28. <u>Severability</u>. If any covenant or other provision
herein shall be determined to be invalid, illegal or
incapable of being enforced by reason of any rule or law or

30

public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect and no covenant or provision of this Agreement shall be deemed to be dependent upon any other unless so expressed herein.

29. <u>Parties not Joint Venturers, Partners, Agents</u>. The parties hereto are not and shall not be construed as joint venturers, partners or agents of each other, and neither party shall have any power to bind or obligate the other, and neither party shall be liable to any person whomsoever for any debts incurred by the other.

30. <u>Time of the Essence</u>. As to all reports and royalties, charges or other fees payable to or to be made to Franchisor, time shall be of the essence.

31. <u>Notices</u>. All notices required hereunder shall be in writing and shall be deemed given and received upon mailing, postage prepaid, via certified or registered mail, to the addresses shown below or to such other address(es) that may hereafter be designated by either party to the other, and shall except as otherwise provided herein be deemed to have been given as of the date so mailed.

31

32.  **Attorney Fees.**   Except as otherwise provided in paragraphs 7(g) and 23(c), regarding the costs of injunctive relief and arbitration, should either party default in any of the covenants and terms hereof, the defaulting party shall pay all costs and expenses, including a reasonable attorney's fee which may result from such default.

DATED this __6__ day of __October__, 19__82__.

I+S

_____   _____
FRANCHISOR                  FRANCHISEE

By_____   __7016 Pine Ave_____
     President              Address

By_____   __Kemmerer WY 83101_____
     Secretary              City, State

32

## SCHEDULE "A"

Excerpt from Federal Trade Commission Decision and Order In the Matter of H & R Block, Inc., Respondent, a corporation, Docket No. C—2162, setting forth certain prohibited activites from which H & R Block, Inc. was ordered to refrain:

1.   Using   any   guarantee   without   clearly   and conspicuously   disclosing   the   terms,   conditions   and limitations of any such guarantee; or misrepresenting, in any manner, the terms and conditions of any guarantee.

2.   Representating, directly or by implication, that Respondent will reimburse its customers for any payments the customer may be required to make in addition to his initial tax payment, in instances where such additional payments result from an error by Respondent in the preparation of the tax return; provided, however, nothing herein shall prevent truthful representations that Respondent will reimburse its customers for interest or penalty payments resulting from Respondent's error.

3.   Failing to disclose, clearly and conspicuously, whenever Respondent makes any representation, directly or by implication, as to its responsiblity for, or obligation resulting from, errors attributable to Respondent in the preparation of tax returns, that Respondent will not assume the liability for additional taxes assessed against the taxpayer.

4.   Representing, directly or by implication, that

respondent will provide legal representation to customers whose tax returns may be audited; or misrepresenting, in any manner, the type or manner of assistance provided by respondent to customers whose returns may be audited.

5.   Using any information concerning any customer of respondent, including the name and/or address of the customer, obtained as a result of the preparation of the customer's tax return for any purpose which is not essential or necessary to the preparation of said tax return, without clearly and conspicuously disclosing to the customer, prior to the obtaining of any information relative to the preparation of the tax return, that respondent intends to use the information for purposes other than the preparation of the customer's return, the exact information which will be used, the particular use which will be made of such information and a description of the parties or entities to whom the information be made available; provided, however, that nothing herein shall prohibit respondent from using names and addresses only of customers for the purpose of communication with such customers solely concerning respondent's income tax preparation business.

6.   Failing to provide each customer in instances where the information described in paragraph 5 hereof will be used for any purpose other than the preparation of the tax return, with a form to be signed by the customer prior to the obtaining of any such information clearly stating that respondent intends to use the information for purposes

other than the preparation of the return, the exact information to be used, the particular use to be made of such information, a description of the parties or entities to whom the information will be made available, and a statement that the customer consents to the use of such information.

SCHEDULE "C"

Franchisor, as Licensee of the names and marks set forth in the foregoing Agreement, has agreed with H & R Block, Inc. of Kansas City, Missouri/or M & V Nelson, Inc., *OR BLock Mt. West, INC.* a Utah corporation, substantially as follows:

(1)  During the term hereof Licensee will not compete, directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, with Block or Block's franchisees/or M & V Nelson, Inc. in the business *OR BLock Mt. West, INC.* of preparing tax returns or performing related services, and

(2)  For a period of three years after the termination, or the transfer or other disposition of this franchise, he will not so compete as aforesaid within 100 miles of the licensed territory. Licensee further covenants that during the term of this Agreement and for a term of three years after the termination or the transfer or other disposition of this license, he will not divulge to or use for the benefit of any person, association or corporation outside of the H & R Block organization, any information or knowledge concerning customers, the methods, promotion, advertising or any other systems or methods of operation of block's business or that of Block's franchisees which Licensee may have acquired by virtue of his operations under this Agreement, nor will Licensee do any deliberate act prejudicial or injurious to the good-will or name of block. Information furnished to employees shall be reasonably limited to that which directly relates to such employee's

duties and assists in the proper performance of such duties. This Agreement is entered into between the parties hereto with the full knowledge of its nature and extent and agreed to by the Licensee and the Licensee hereby acknowledges that the qualifications for a franchise by Block or Franchisor are special, unique and extraordinary, and that this Agreement would not be entered into by block or Franchisor except upon condition that such restrictive covenants be embodied herein and as such be enforceable, in the event of a breach by Licensee, by injunctive relief, provided that the expenses of instituting such legal action by block or Franchisor shall not be a liability of Licensee unless so ordered by court decision.

as of _____, 198

H & R Block, Inc.
Professional Management Service Co.
848 So. 200 East
Salt Lake City, Utah 84111

Gentlemen:

Re:   Notice of transfer to controlled entity

The undersigned franchisee hereby gives notice to you of the transfer and assignment of a certain franchise agreement(s) (identified in the attached Assignment Agreement) to the entity described in said Assignment Agreement.

The undersigned franchisee acknowledges and agrees that, notwithstanding such transfer and assignment, the undersigned continues to remain liable for the prompt and faithful performance of all terms, covenants and conditions of said franchise agreement(s) as provided therein.

Very truly yours,

_____
Franchisee

ASSIGNMENT AGREEMENT

(for transfer to a controlled entity)


THIS AGREEMENT is made and entered into as of _____,
_____, by _____ (the "Franchisee") and
_____ (the "controlled   entity"),
WITNESSETH:

WHEREAS, the Franchisee is holder of the right to
prepare income tax returns under the name and service mark
"H & R Block" pursuant to the Franchise agreement(s)
described in Schedule A, which is attached to this Agreement
and constitutes a part of it (the "agreement(s)"), and

WHEREAS, the Franchisee desires to transfer and assign
to the controlled entity all of the Franchisee's right,
title and interest under the agreement(s) and the controlled
entity desires to accept such transfer and assignment and to
assume and be bound by all of the terms, covenants,
conditions and obligations incumbent upon the Franchisee
under the agreement(s) and

WHEREAS, the Franchisee recognizes that such transfer
and assignment may be made only upon compliance with certain
terms and conditions of the franchise agreement(s),

NOW THEREFORE, in consideration of the foregoing and
the mutual promises contained in this Agreement, the
parties, covenant, represent and agree as follows:

1.    Assignment.   The Franchisee hereby transfers,
assigns and delivers to the controlled entity all of the
Franchisee's right, title and interest in and to the
agreement(s) and any and all deposits held by the franchisor
under the agreement(s), in each case subject to all of the
terms, covenants, conditions and obligations incumbent upon
the Franchisee under the agreement(s).

2.    Acceptance.   The controlled entity hereby
accepts such transfer, assignment and delivery of the
Franchisee's right, title and interest in and to the items
described above and, for the benefit of the Franchisee and
the franchisor of the agreement(s), and the controlled
entity hereby assumes, and agrees to be bound by and to
faithfully perform, all of the terms, covenants, conditions
and obligations incumbent upon the Franchisee under the
agreement(s).

3.    Compliance with Satellite Agreement(s).   In
compliance with the last paragraph of paragraph 16 of the
agreement(s), the Franchisee represents and warrants that
the Franchisee is the holder, directly or indirectly, of a

majority (over 50%) of each class of voting securities of the controlled entity, and that set forth on Schedule B (which is attached to this Agreement and constitutes a part of it) are the names and addresses of the officers, directors and holders of 10% or more of each class of voting securities of the controlled entity. In further compliance with said paragraph 16 an executed copy of this Agreement is being sent to, and the agreements, representations and warranties herein are thus made for the benefit of, the franchisor under the agreement(s).

IN WITNESS WHEREOF, this Agreement has been executed by the parites hereto as of the date first written above.

_____
"Franchisee"

_____
by
"Controlled entity"

## SCHEDULE A

### Major Franchise Agreement(s)

Date of Agreement

Franchise Territory

SCHEDULE B

Officers, Directors and Stockholders
of
Professional Management Services Co.

Name

Address

Title

# BILL OF SALE
## (Customer Lists, Etc.)

KNOW ALL MEN BY THESE PRESENTS:

THAT Block Mountain West, Inc., H&R Block of Idaho, Inc., H&R Block of Utah, Inc., Income Tax Services, Inc., and Block Management, Inc. (Collectively "Seller"), for and in consideration of the payment made September 22, 2003 by H&R Block Eastern Tax Services, Inc. ("Buyer") to Seller, and such further payments by Buyer to Seller as may come due in the future, and other good and valuable considerations, the receipt of which is hereby acknowledged, does hereby bargain, sell, grant, convey, assign, transfer and deliver unto Buyer, its successors and assigns forever all customer lists, customer names, forms, files and copies of tax returns in the custody of Seller or obtained in operating its businesses as a tax preparer under any and all of the Major Franchise Agreements between Seller and HRB Royalty, Inc. or any affiliate thereof, free and clear of all liens, mortgages, claims and encumbrances.

Seller hereby warrants and represents that it has good and marketable title to all of the property and assets to be transferred hereunder.

Except for the foregoing, Buyer acknowledges that the transfer is made without representation or warranty (express or implied) by Seller. The Assets are being transferred "AS IS." Buyer acknowledges it has made its own due diligence with respect to the Assets being acquired and the employees of Seller being hired, and Buyer is not relying on any representation or warranty of Seller.

TO HAVE AND TO HOLD the same unto the said H&R Block Eastern Tax Services, Inc. and unto its successors and assigns forever.

IN WITNESS WHEREOF, this instrument is signed on the _17_ day of _Sept_, 2003.

BLOCK MOUNTAIN WEST, INC., H&R BLOCK OF IDAHO, INC., H&R BLOCK OF UTAH, INC., INCOME TAX SERVICES INC., AND BLOCK MANAGEMENT, INC.

By: _M. Nick Nelson_

# BILL OF SALE, ASSIGNMENT AND CONVEYANCE

THIS BILL OF SALE, ASSIGNMENT AND CONVEYANCE is made as of the 22nd day of September, 2003 (the "Effective Date"), by and among Block Mountain West, Inc., H&R Block of Idaho, Inc., H&R Block of Utah, Inc., Income Tax Services, Inc., and Block Management, Inc. (collectively "Assignor" or "Seller") having an address of 380 E. Main Street, Building B, Midway, Utah 84049 and H&R Block Eastern Tax Services, Inc. ("Buyer") having a notice address of 4400 Main Street, Kansas City, Missouri 64111.

**WITNESSETH:**

**WHEREAS,** the Seller desires to sell, and the Buyer desires to purchase, certain assets of the Seller pursuant to the terms and conditions set forth herein.

**NOW, THEREFORE,** the parties hereto agree as follows:

1.     The Seller, for and in consideration of the September 22, 2003 payment by Buyer to Seller and such further payments by Buyer to Seller as may become due in the future, does, as of the Effective Date, grant, bargain, sell, convey, assign, transfer, set over and deliver unto the Buyer, all right, title and interest of the Seller in and to all of the assets, properties, interests and rights of the Seller which are specifically set forth on **Schedule A** attached hereto and made a part hereof (collectively, the "Assets").

2.     Seller acknowledges that this Bill of Sale, Assignment and Conveyance is limited to the Assets hereinafter specifically set forth, and it is the intention of the parties that Buyer shall not assume any liabilities of the Seller.

3.     Seller represents that it has full and complete title and ownership of said Assets, has the right and authority to transfer said Assets to Buyer, and that such Assets will be transferred to the Buyer on the Effective Date free and clear of liens, security interests, debts or other encumbrances.

4.     The Seller further represents that it will at any time and from time to time after the Effective Date, upon the request of the Buyer, execute, acknowledge, deliver and perform, or cause to be executed, delivered, or performed, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required for the better vesting and confirming unto the Buyer of the title to and possession of any and all of the Assets acquired by the Buyer from the Seller hereunder.

5.     Except for the foregoing, Buyer acknowledges that the transfer is made without representation or warranty (express or implied) by Seller. The Assets are being transferred "AS IS." Buyer acknowledges it has made its own due diligence with respect to the Assets being acquired and the employees of Seller being hired, and Buyer is not relying on any representation or warranty of Seller.

6.     Seller acknowledges that the September 22, 2003 payment by Buyer to Seller, referred to in Section 1 hereof, does not jeopardize Buyer's rights to verify the numbers supplied by Seller, which Buyer relied upon to calculate the amount of the payment, and make adjustments to the payment based on such verification process.  Buyer acknowledges that the September 22, 2003 payment by Buyer to Seller, referred to in Section 1 hereof, does not jeopardize Seller's rights to claim and receive payment for the fair and equitable value of the business of Seller being transferred to Buyer pursuant to Paragraph 24 of the Major Franchise Agreements between Seller and Block, and the Order of the Circuit Court of Jackson County, Missouri, in Case No. 99 CV 206379 dated June 3, 2003.

7.     Upon request, Buyer agrees to provide to Seller after the Effective Date copies of all documents, records, and information assigned pursuant hereto upon reasonable notice provided such requests are for legitimate business purposes of Seller.  Upon request, Seller agrees to provide to Buyer after the Effective Date copies of Seller's documents, records, and information that relate to the business operated under the above-referenced Major Franchise Agreements upon reasonable notice, provided such requests are for legitimate business purposes of Buyer.

8.     The parties acknowledge that the amount included in the September 22, 2003 payment is an estimate, and the parties agree that the September 22, 2003 payment shall be adjusted, up or down, after the date hereof as final information becomes available.

**IN WITNESS WHEREOF,** the Seller has executed this Bill of Sale, Assignment and Conveyance as of the date first written.

SELLER:

BLOCK MOUNTAIN WEST, INC., H&R BLOCK OF IDAHO, INC., H&R BLOCK OF UTAH, INC., INCOME TAX SERVICES, INC., AND BLOCK MANAGEMENT, INC.

By:   _Martt Nelson_

BUYER:

H&R BLOCK EASTERN TAX SERVICES, INC.

By: _____

Title: Senior Vice President

## SCHEDULE A

List of Assets

1.   All real estate lease agreements to which to the Seller is a party and which relate primarily or exclusively to Seller's operation of an income tax preparation (and related services) business (the "Business").

2.   All general, financial and personnel records, ledgers, sales invoices, accounts and payable records, files, forms, books, documents, correspondence, client tax returns, customer lists, employee lists (including addresses), sales records, FranTap data, TTS mailing lists and other files and records, including electronic versions of any of the foregoing, of Seller pertaining primarily or exclusively to Seller's operation of the Business.

3.   All tangible property used by Seller primarily or exclusively with respect to Seller's operation of the Business, including, but not limited to all supplies, equipment, inventory and office keys.

4.   All intellectual property used by Seller primarily or exclusively with respect to Seller's operation of the Business.

5.   All tax professional employment agreements to which Seller is a party for the past two (2) tax seasons.

6.   All rights Seller has to obtain all client files, client lists and other client data related to the operations of Seller's subfranchises, to the extent Seller has rights in such data.

## ASSIGNMENT OF SATELLITE

## FRANCHISE AGREEMENT

FOR VALUE RECEIVED, Income Tax Service, Inc. for good and valuable consideration, does hereby sell, assign, and transfer to H&R Block Eastern Tax Services, Inc. all rights of the Assignor and delegates to such Assignee all of the duties of the Assignor under a certain Satellite Franchise Agreement, dated October 6, 1982, between the Assignor and Danny Griff, a true copy of which is annexed hereto and made a part hereof.

IN WITNESS WHEREOF, this instrument is signed on the _17_ day of _Sept_, 2003.


ASSIGNOR:

INCOME TAX SERVICE, INC.

By: _[signature]_



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To  Danny Griff
Street, Apt. No.; or PO Box No.  62 McGovern Ave.
City, State, ZIP+ 4  Diamondville, WY  83116

PS Form 3800, January 2001          See Reverse for Instructions

7001 1140 0002 9025 8053



**H&R BLOCK**                                                      tax and financial services

Steven A. Christiansen
Vice President                                    December 4, 2003
Corporate Counsel & Secretary

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Danny Griff
62 McGovern Avenue
Diamondville, Wyoming  83116


Dear Mr. Griff:

In September 2003, H&R Block's major franchise agreements with the Nelsen organization ("Nelsen") expired due to non-renewal.  As a result, Nelsen no longer has the right to operate an income tax service under the H&R Block name.

You have subfranchise agreements with Nelsen by which Nelsen granted you the right to operate an H&R Block income tax service in Evanston, Wyoming, Kemmerer, Wyoming, and Urie, Wyoming, under one or more of Nelsen's major franchise agreements.  While Nelsen has assigned to H&R Block certain assets of its former H&R Block business, H&R Block has made it clear to counsel for Nelsen that H&R Block has no obligation to, and will not, acquire or assume any obligation of "franchisor" under any of Nelsen's subfranchise agreements.  As a result, your subfranchise agreements have expired by operation of law upon the expiration of Nelsen's underlying major franchise agreements, and we have no obligation to you under your subfranchise agreements, including, without limitation, any obligation to make any payment to you which Nelsen may have agreed to make upon termination of your subfranchise agreements.

H&R Block has offered you the opportunity to enter into a direct franchise agreement with H&R Block under its current form of franchise agreement that was tendered to you.  You did not accept that offer and the time for your acceptance has expired.  We understand that you have made plans to continue to operate an income tax service in your former H&R Block territories and that, among other things, you have retained the customer files and phone number used for your former H&R Block business which we anticipate that you intend to use for a competing tax service.

Your subfranchise agreements with Nelsen contain a provision that requires you, upon termination of such agreements, to transfer to Nelsen the customer lists and files for the business of the franchise.  Such provision may refer to receipt of a payment from Nelsen.  However, it appears that Nelsen's payment obligation, if any, does not apply in the event Nelsen's right to use the H&R Block name is terminated.  Nelsen's assignment of assets to H&R Block includes,

Mr. Danny Griff
December 4, 2003
Page 2

without limitation, all of Nelsen's right to obtain client files and client lists related to the operation of Nelsen's subfranchises. Therefore, we have a right to enforce the post-termination rights of Nelsen with respect to the customer files and demand that you immediately deliver to us the customer lists and customer tax returns of your former H&R Block business. We will maintain the confidentiality of such files, which will be used solely to provide tax-related services to the H&R Block customers to whom the files relate. We also demand that you comply with such other post-termination obligations of your subfranchise agreements with respect to competing with the Franchisor under such agreements.

As a result of the expiration of your subfranchise agreements, you no longer have the right to continue using the H&R Block name. We understand that the phone number used by you for your former H&R Block business is listed in the phone directory under the H&R Block name and such use, if continued, is prohibited by the subfranchise agreements and constitutes trademark infringement. Therefore, we demand that you discontinue the use of such phone number and assign such number to us immediately. We also demand that you discontinue using and surrender to us immediately any H&R Block signs and other marketing materials bearing the H&R Block name. Provide us with your written assurance that any H&R Block signs for your former H&R Block business can no longer be seen by the public.

You may have received through Nelsen H&R Block training materials and software used for preparing tax returns and keeping track of the financial results of your former H&R Block business. The software and training materials are proprietary to H&R Block and bear the H&R Block name. Therefore, we demand that you cease and desist from using such software and training materials and that you immediately surrender to us such materials and software, including any copies thereof.

Please respond to this letter within ten days from its date to make arrangements for complying with the demands set forth above. You may contact me at 816-932-8492 or Doug French, our franchise district manager, at 307-632-4724. We reserve the right to take further action in the event we do not receive a satisfactory response.

Sincerely,

Steven A. Christiansen

SAC/sw
c:    Ken Treat
      Bruce Johansson (via email)
      John Greenway (via email)
      Doug French (via email)
      Georgene Rowland (via email)